# United States Court of Appeals
# for the Federal Circuit

———————————

**ASPEX EYEWEAR, INC., AND CONTOUR OPTIK, INC.,**
*Plaintiffs-Appellants,*

**v.**

**MARCHON EYEWEAR, INC., AND NIKE, INC.,**
*Defendants-Appellees,*

**and**

**REVOLUTION EYEWEAR, INC., AND GARY MARTIN ZELMAN,**
*Defendants-Appellees.*

———————————

2011-1147

———————————

Appeal from the United States District Court for the Southern District of Florida in Case No. 09-CV-61515, Judge Marcia G. Cooke.

———————————

Decided: March 14, 2012

———————————

MICHAEL A. NICODEMA, Greenberg Traurig, LLP, of Florham Park, New Jersey, argued for plaintiffs-appellants.

EDGAR H. HAUG, Frommer Lawrence & Haug LLP, of New York, New York, argued for defendants-appellees, Marchon Eyewear, Inc. and Nike, Inc. With him on the brief were PORTER FARRAR FLEMING and BRIAN S. GONCALVES.

STEVEN M. HANLE, Sheppard, Mullin, Richter & Hampton, LLP, of Costa Mesa, California, argued for defendants-appellees Revolution Eyewear, Inc. and Gary Martin Zelman. With him on the brief was JENNIFER A. TRUSSO.

_____

Before RADER, *Chief Judge*, BRYSON and REYNA, *Circuit Judges.*

BRYSON, *Circuit Judge.*

Aspex Eyewear, Inc., is the owner of U.S. Patent No. RE37,545 ("the '545 patent"). That patent, which is entitled "Auxiliary Lenses for Eyeglasses," is directed to magnetic clip-on eyewear. It discloses primary eyeglass frames designed so that auxiliary frames, typically containing sunglass lenses, can be attached to the primary frames by magnetic force. The '545 patent claims the combination of an auxiliary frame magnetically secured to a primary frame (claims 1-21 and 25-34), a primary frame capable of magnetically engaging an auxiliary frame (claim 22), and an auxiliary frame capable of magnetically engaging a primary frame (claim 23 as amended in reexamination, claim 24, and new claim 35, added during reexamination). Aspex and Contour Optik, Inc., were co-owners of the '545 patent until June 2010, when Contour assigned its rights to Aspex.

Revolution Eyewear, Inc., is a manufacturer of eyeglass frames and auxiliary sunglass frames that can be

attached to the front of eyeglass frames. Revolution's IMF and IMFT products featured eyeglass frames having projections from the temple regions on each side of the frames. The projections on the primary frames housed magnetic elements. Those projections corresponded to projections on Revolution's auxiliary sunglass frames that also contained magnetic elements. The magnetic elements in the primary and auxiliary frames were used to attach the auxiliary frames to the primary frames by magnetic force. Revolution's IMF and IMFT products were designed so that the magnetic elements in the auxiliary frames would attach to the bottom of the magnetized projections on the primary frames. The parties refer to that design as the Old Design.

Aspex and Revolution have been suing one another for more than a decade. In 1999, Aspex sued Revolution for infringement of Aspex's U.S. Patent No. 5,568,207 ("the '207 patent"). The district court in that case ruled that claim 1 of the '207 patent was directed to a combination of frames in which the projections of the auxiliary frame are mounted on top of the projections of the primary frame. Because Revolution's products used a "bottom-mounted" configuration, the court granted Revolution's motion for summary judgment of noninfringement. This court summarily affirmed. *Aspex Eyewear, Inc. v. Revolution Eyewear, Inc.*, 42 F. App'x 436 (Fed. Cir. 2002).

In 2002, Revolution sued Aspex in the United States District Court for the Central District of California, charging Aspex with infringement of Revolution's patent, U.S. Patent No. 6,343,858 ("the Revolution California Action"). Aspex counterclaimed, asserting that certain of Revolution's products infringed claims 6, 22, and 34 of the '545 patent, the reissue of Aspex's '207 patent. The district court dismissed Revolution's complaint for lack of

standing. On Aspex's counterclaim, the district court granted summary judgment to Revolution as to claims 6 and 34 of the '545 patent, which are directed to primary and auxiliary frame combinations. The court construed claim 6 to read on auxiliary frames having a downwardly facing horizontal surface and claim 34 to require that some portion of each arm of the auxiliary frame extend across the top of the corresponding extension of the primary frame. Because the magnetic surfaces of Revolution's auxiliary frames faced upwardly, not downwardly, and because the arms of Revolution's auxiliary frames extended underneath, not above, the corresponding extensions on the primary frames, the court held that Revolution's products did not infringe those claims. As to claim 22, however, the district court granted Aspex's motion for summary judgment of infringement, holding that Revolution's primary frames literally infringed that claim.

Claim 22 recites a primary spectacle frame that is capable of magnetically engaging an auxiliary spectacle frame, in which the primary frame includes a pair of projections for securing the primary frame magnetic members. The district court construed that claim to require that the primary frame be capable of magnetically engaging an auxiliary frame from the top. Although Revolution's IMF and IMFT primary frames were designed to magnetically engage Revolution's auxiliary frames from the bottom, Revolution did not dispute that an auxiliary frame is capable of engaging Revolution's IMF primary frame from above. Accordingly, the district court held that Revolution's accused products literally infringed claim 22 of the '545 patent.

The court then held, on summary judgment, that claim 22 of the '545 patent was not invalid. Following a jury trial on damages, the court awarded a judgment of

more than $4 million to Aspex and Contour. This court affirmed that judgment in 2009. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358 (Fed. Cir. 2009).

In late 2006, while the 2002 case involving Revolution was still pending, Aspex sued Marchon Eyewear, Inc., in the United States District Court for the Central District of California, alleging infringement of the '545 patent ("the Marchon California Action"). Aspex alleged that pursuant to a license from Revolution, Marchon was selling magnetic eyewear incorporating the same Old Design structure as that used by Revolution.

In early 2007, Revolution redesigned its products by embedding the magnetic elements in its primary eyeglass frames rather than securing them in projections, as was done in the Old Design. The parties refer to the modified version as the New Design. The auxiliary frames in the New Design were also modified to accommodate the new placement of the magnets in the primary frames. Marchon also began selling New Design primary and auxiliary frames.

Early in 2008, Aspex and Marchon entered into a settlement agreement that resolved all the claims and counterclaims asserted in the 2006 Marchon California Action. The agreement stated that Aspex and Marchon "stipulate to dismissal with prejudice of [the action], including all claims and counterclaims, and any claim which would have been had by and between the Parties arising from or connected with [the action] . . . ." In another paragraph, the agreement provided that the settlement extended to all causes of action "which exist as of the Effective Date of this Agreement in connection with any Marchon Old Design Magnetic Eyewear made, sold, used, or offered for sale in the United States as of the Effective Date." Mar-

chon further agreed to discontinue all products embodying the Old Design and substantially similar designs.

In the meantime, the Patent and Trademark Office ("PTO") reexamined the '545 patent at the behest of a third party requester. In April 2008, at the conclusion of the reexamination proceeding, the PTO rejected a number of the claims of the '545 patent for obviousness, but it confirmed the patentability of several of the claims, including claim 23 as amended, and it allowed the patentee to add new claim 35. Claim 23, as amended, reads as follows (the italicized words were added and the bracketed word removed as a result of the amendment):

> 23. An eyeglass device comprising:
>
> an auxiliary spectacle frame for supporting auxiliary lenses therein, said frame including a front side, a rear side, and oppositely positioned side portions, each of said side portions having an arm extended therefrom, each of said arms having a rearwardly directed free end for securing a magnetic member *having a horizontal surface*, and a pair of magnetic members respectively secured in the free ends of said arms, said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame so that said pair of magnetic members *having a horizontal surface* can vertically engage corresponding magnetic [members] *member surfaces* on a primary spectacle frame.

New claim 35, added during reexamination, reads as follows:

35.  The eyeglass device according to claim 23, wherein, said magnetic members of said auxiliary spectacle frame are magnets.

In 2009, Aspex filed the present action, charging the defendants with infringement of amended claim 23 and new claim 35 of the '545 patent.  Aspex alleged direct infringement by Revolution and Marchon, and it alleged induced infringement by Nike, Inc., Hardy Life, LLC, and Gary Zelman, Revolution's owner.  The accused products were New Design magnetic clip-on eyewear made by Revolution and Marchon.

Revolution moved to dismiss the action against it as barred by res judicata based on its previous litigation with Aspex.  Marchon likewise moved to dismiss the action against it based on res judicata; in addition, it contended that the action was barred by the 2008 agreement that had settled the 2006 Marchon California Action.

The district court granted summary judgment to all the defendants.  It held that for purposes of res judicata Aspex's claims for infringement were the same as the claims that either were, or could have been, raised in the 2006 and 2008 California Actions.  The court ruled that the accused products in this case—the auxiliary frames sold by Revolution and Marchon—were essentially the same as the products from the earlier cases.  The court stated that the "accused infringement of claim 23 could have been litigated with the California Actions because Plaintiffs knew how . . . Revolution's and Marchon's auxiliary frame interfaced with the primary frame."  The court noted that the Revolution California Action had been fully adjudicated on the merits, and it held that the settlement agreement in the Marchon California Action

had "made clear that the settlement dismissed with prejudice as to any causes of action 'any claim which could have been had by and between the Parties arising from or connected with'" that action.  The court explained that the reexamination of the '545 patent did not entitle the plaintiffs to avoid claim preclusion "because the amended claims relate back to the original '545 Patent reissue date."  Because the court concluded that the claims against Revolution and Marchon "relate to the same set of transactions as those litigated in the California Actions," the court held that Aspex's action is barred by claim preclusion.  *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, Case No. 09-61515-CIV (S.D. Fla. Nov. 3, 2010).  Aspex appealed.

I

Aspex first challenges the district court's judgment dismissing its infringement actions against Revolution and Marchon based on the doctrine of res judicata, or claim preclusion.  Aspex's main argument is that res judicata does not bar this action, because Aspex's claims in this case are based on claims 23 and 35, as amended and added in reexamination.  Because those claims were not in existence (at least not in the same form) at the time the prior actions were filed against Revolution and Marchon, Aspex argues that the new claims created new causes of action that Aspex could not have pursued in the previous cases.  Accordingly, Aspex argues, res judicata does not bar it from pursuing the claims in this case.[1]

---

[1]     Because the general principles of res judicata are not unique to patent law, we look to regional circuit law for guidance in applying those principles. *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008).  However, the question whether a particular claim in a

We reject Aspex's argument as to the effect of the reexamination. Amended claim 23 and new claim 35 of the reexamined '545 patent did not create new causes of action for Aspex, separate from the causes of action created by the original '545 patent. Those two claims were merely new versions of claims that were part of the '545 patent prior to its reexamination. Amended claim 23 tracked original claim 23 in all respects except for the addition of the limiting words "having a horizontal surface" at two points in referring to the "pair of magnetic members," and the substitution of the phrase "member surfaces" for the word "members" in referring to the corresponding structure on the primary spectacle frame. New claim 35 recited "[t]he eyeglass device according to claim 23, wherein, said magnetic members of said auxiliary spectacle frame are magnets."

We agree with the district court that the changes made to claim 23 in reexamination were insubstantial. As the district court explained, the '545 patent had already been interpreted to disclose an invention featuring a top-mounted auxiliary frame that vertically engages a primary frame, and the claims had been construed to require top mounting by the auxiliary frame. The presence of a pair of magnetic members "having a horizontal surface" was therefore already implicit in claim 23 before its reexamination, as was the presence of magnetic "member surfaces" on the primary frame. As for new claim 35, the limitation requiring the magnetic members of the auxiliary frames to be "magnets" is an insignificant

---

patent case is the same as or separate from another claim has special application to patent cases, and we therefore apply our own law to that issue. *See Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1379 (Fed. Cir. 2008).

change that, at most, narrows the scope of the claim in a way that does not affect the products here at issue.

Given the relationship between the original claims of the '545 patent and the amended and new claims that Aspex relies upon in this litigation, there is no force to Aspex's argument that the reexamination of the '545 patent created entirely new causes of action on which Aspex could freely sue, even though it had previously had an opportunity to sue on the corresponding original claims of the '545 patent. Aspex could have sought relief for infringement of original claim 23 of the '545 patent in the previous litigation against Revolution and Marchon, but it elected not to do so. To allow Aspex to pursue amended claim 23 and new claim 35 in this case would thus present a clear instance of "claim splitting," which is forbidden by the principles of res judicata. *Mars Inc. v. Nippon Conlux Kabushi-Kaisha*, 58 F.3d 616, 619 (Fed. Cir. 1995).

In arguing that the reexamination of the '545 patent created new causes of action not barred by res judicata, Aspex relies on cases involving reissue patents. There are two problems with Aspex's argument, however. First, as noted above, the two claims on which Aspex relies are not materially different from original claim 23, and thus they do not create a new cause of action that was not previously available to Aspex. Second, the differences between reissue and reexamination make the reissue cases on which Aspex relies inapposite. Unlike reissue, reexamination does not result in the surrender of the original patent and the issuance of a new patent. Moreover, by statute, new claims that emerge from reexamination must not be broader than the original claims. *See* 35 U.S.C. § 305 ("No proposed amended or new claim enlarging the scope of a claim of a patent will be permitted in a reex-

amination proceeding under this chapter."); *In re Freeman*, 30 F.3d 1459, 1464 (Fed. Cir. 1994). Consistent with that rule, the claims on which Aspex relies are not broader than their predecessor; they therefore did not create a new legal right against infringement that Aspex lacked under the original version of the patent. Accordingly, claims that emerge from reexamination do not create a new cause of action that did not exist before. *See Hoffman v. Wisner Classic Mfg. Co.*, 927 F. Supp. 67, 73 (E.D.N.Y. 1996). We therefore reject Aspex's argument that the issuance of amended claim 23 and new claim 35 had the effect of negating the res judicata effect of the prior litigation by Aspex against Revolution and Marchon under the original '545 patent claims.

## II

While we reject Aspex's principal argument regarding res judicata, we find merit in one of its secondary arguments. The extent to which this issue will affect the ultimate outcome of the case is unclear, but it is a legal issue that requires us to remand the case to the district court for further proceedings. Both Revolution and Marchon argue that because the accused products at issue in this case are "essentially the same" as the allegedly infringing products that were at issue in the earlier litigation, the district court properly invoked res judicata to hold that all of Aspex's claims against both Revolution and Marchon are barred. At oral argument, the defendants made clear that they regarded that argument as applicable even with respect to particular goods that were made and sold after the initiation and conclusion of the California Actions and thus were not in existence at the time of that earlier litigation.

We hold that res judicata does not bar Aspex's lawsuit with respect to accused products that were not in existence at the time of the California Actions for the simple reason that res judicata requires that in order for a particular claim to be barred, it is necessary that the claim either was asserted, or could have been asserted, in the prior action. If the claim did not exist at the time of the earlier action, it could not have been asserted in that action and is not barred by res judicata.

In this case, Aspex contends that it is asserting infringement by products that were made and sold only after the California Actions were brought, and in the case of some of the products, after the California Actions were over. Although the parties debate whether the design of those products is essentially the same as the design of the products that were the subjects of the California Actions, that does not matter with respect to products that were made or sold after the time of the previous lawsuits.

Under well-settled principles, a party who sues a tortfeasor is ordinarily not barred by a prior judgment from seeking relief for discrete tortious action by the same tortfeasor that occurs subsequent to the original action. That rule is based on the principle that res judicata requires a party to assert all claims that the party could have asserted in the earlier lawsuit; it follows that if the party could not have asserted particular claims—because the tortious conduct in question had not occurred at that time—those claims could not have been asserted and therefore are not barred by res judicata. *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) (a prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case"); *Manning v. City of Auburn*, 953 F.2d 1355, 1359 (11th

Cir. 1992) (res judicata does not bar claims for conduct occurring after judgment); *Blair v. City of Greenville*, 649 F.2d 365, 368 (5th Cir. 1981) (res judicata "does not . . . bar a suit based on acts of the defendant that have occurred subsequent to the final judgment asserted as a bar"); *Kilgoar v. Colbert Cnty. Bd. of Educ.*, 578 F.2d 1033 (5th Cir. 1978) (claims based on conduct transpiring after the close of prior litigation were not precluded by res judicata even though earlier litigation involved the same kind of conduct); *see generally* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4409, at 227 (2002) ("A substantially single course of activity may continue through the life of a first suit and beyond. The basic claim-preclusion result is clear: a new claim or cause of action is created as the conduct continues."); 18 James Wm. Moore, *Moore's Federal Practice* § 131.23[3][c] (2011) ("It is clear that wrongful conduct that occurs after the judgment is entered in a prior action is not within the scope of claim preclusion . . . .").

That principle has been applied to patent cases, and in particular to cases involving sequential acts of infringement; in that setting, this court and others have characterized the "claim" that gives rise to preclusion as encompassing only the particular infringing acts or products that are accused in the first action or could have been made subject to that action. *See Young Eng'rs, Inc. v. U.S. Int'l Trade Comm'n*, 721 F.2d 1305, 1316 (Fed. Cir. 1983) ("With respect to patent litigation, we are unpersuaded that an 'infringement claim,' for purposes of claim preclusion, embraces more than the specific devices before the court in the first suit."); *Cordis Corp. v. Boston Scientific Corp.*, 635 F. Supp. 2d 361, 369-70 (D. Del. 2009) (claim preclusion will not bar a second suit for damages for conduct occurring after the first judgment); *Williams*

*v. Gillette Co.*, 887 F. Supp. 181, 183-85 (N.D. Ill. 1995) (because second lawsuit seeks damages only for infringement after the dismissal of the first, it is not barred by res judicata); *MGA, Inc. v. Centri-Spray Corp.*, 699 F. Supp. 610, 614 (E.D. Mich. 1987) ("if the plaintiff claimed that different products infringed the patent in suit, the prior adjudication would not act as a bar to the subsequent claim"). As a result, Aspex's claims, which stem from alleged infringement of products created after the California Actions, are not barred.

In arguing to the contrary, Revolution relies on this court's decision in *Nystrom v. Trex Co.*, 580 F.3d 1281, 1285-86 (Fed. Cir. 2009), to support its claim that res judicata bars Aspex's claims in this case. The *Nystrom* court held that particular claims were barred based on previous litigation between the same parties. The previous litigation in that case, however, had resolved certain issues against the appellant, and the appellant sought to litigate those issues again in the second case, hoping for a different outcome. Because those issues had been resolved against the appellant in the first case, this court held that the appellant was precluded from relitigating them. In so doing, the court applied the doctrine generally referred to as collateral estoppel or issue preclusion. Although the *Nystrom* court characterized its analysis as falling under the general rubric of res judicata or claim preclusion, the principle that the court applied was that when a party that has had a full and fair opportunity to litigate an issue and has lost on that issue, it may not relitigate that issue in a later case. *See Comm'r v. Sunnen*, 333 U.S. 591, 597-98 (1948) (in a second action "upon a different cause or demand, the principle of *res judicata* is applied much more narrowly," only as to "matters which were actually litigated and determined in the first proceeding"; in that setting, "*res judicata* is usually and

more accurately referred to as estoppel by judgment, or collateral estoppel").

As we note below, collateral estoppel principles may have a role to play in this case, but that is an issue that must be addressed on remand. However, the separate res judicata argument that Revolution and Marchon have made—that the California Actions bar Aspex from obtaining relief for acts of infringement post-dating those actions—is not based on collateral estoppel principles, as it does not depend on any effort by Aspex to relitigate any issue on which it lost in the California Actions. The *Nystrom* case is therefore of no help to the defendants on that issue.

At oral argument, Revolution contended that in order to preserve its right to relief for subsequent acts of infringement, Aspex should have pursued injunctive relief in the California actions rather than seeking to bring a new infringement action. There are several problems with that argument.

First, as a factual matter, Aspex did seek and the district court in the California case did issue, an injunction against Revolution. The injunction, however, covered only the Old Design products, the IMF and IMFT frames, which were the only types of frames at issue in that litigation. That injunction does Aspex no good with respect to New Design products, which are the products at issue in this case.

Second, as to Revolution's suggestion that Aspex should have obtained a broader injunction, district courts are frequently admonished not to issue sweeping injunctions against potentially infringing activities in patent cases, but to restrict the scope of the injunction to the

particular adjudicated infringing activity. *See Forest Labs., Inc. v. Ivax Pharm., Inc.*, 501 F.3d 1263, 1272 (Fed. Cir. 2007); *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004); *Additive Controls Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 479-80 (Fed. Cir. 1993). A patentee's right to recover for post-judgment acts of infringement should not depend on the willingness of a court to issue an injunction that would test the permissible limits of injunctive breadth.

Third, the Supreme Court has held that injunctions should not be routinely granted in patent cases. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). It is therefore likely that there will be many instances in which an injunction has not been issued, but in which an infringer continues with its infringing activities. In that setting, a new action for infringement is the patentee's only recourse. It would be peculiar (and exceptionally unfair) to invoke res judicata to bar any further relief to a patentee in such a situation, thus effectively giving the infringer an unpaid license for the remainder of the life of the patent based on an earlier judgment of infringement.

Finally, the Supreme Court in the *Lawlor* case rejected essentially the same argument, pointing out that there was "no merit" to the respondents' contention in that case that the petitioners were precluded from bringing a second action "by their failure to press their demand for injunctive relief" in the first. 349 U.S. at 329. "Acceptance of the respondents' novel contention," the Court observed, "would in effect confer on them a partial immunity from civil liability for future violations." *Id.* The same would be true here.

Our resolution of the res judicata issue leaves open two questions, both of which will need to be addressed by

the trial court. The first is what to do about the products that were made or sold during the pendency of the California Action between Aspex and Revolution. In patent cases, this court has applied the general rule that res judicata does not bar the assertion of "new rights acquired during the action which might have been, but were not, litigated." *Gillig v. Nike, Inc.*, 602 F.3d 1354, 1363 (Fed. Cir. 2010), quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 370 (2d Cir. 1997); *see also Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992) ("for res judicata purposes, claims that 'could have been brought' are claims in existence at the time the original complaint is filed or claims *actually* asserted by supplemental pleadings or otherwise in the earlier action"). While a party may seek to pursue claims that accrue during the pendency of a lawsuit adjudicated in that lawsuit, the party is not required to do so, and res judicata will not be applied to such accruing claims if the party elects not to have them included in the action. *Gillig*, 602 F.3d at 1363; *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1298 (11th Cir. 2001); *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000). The question to be resolved on remand, then, is whether in the course of the 2002 Revolution action in California, the parties consented to have the court adjudicate their rights as to products that were made and sold during the pendency of that case. That is a matter for the district court to determine on remand based on a presentation by the parties as to the record in the California Revolution case.

A second issue that must be reserved for remand is the effect, if any, of collateral estoppel, or issue preclusion, in this case. As noted above, Revolution has suggested that collateral estoppel may apply in this case based on the resolution of other issues between the parties at some point in the complex course of their litigation

with one another.  We do not address that contention, because the district court did not base its judgment on collateral estoppel and the parties have not fully briefed it.  If either Revolution or Marchon wishes to press that issue on remand, they will have to make an appropriate record regarding any issues that were resolved against Aspex in earlier litigation that may bear on the issues in this case.

III

Aspex next argues that the district court erred in granting Marchon's motion for summary judgment of noninfringement in light of the settlement agreement that terminated Aspex's 2006 action against Marchon.  In a settlement agreement, the parties to an action can determine for themselves what preclusive effect the settlement of the first action will have as to any potential subsequent actions between the parties.  *Pactiv Corp. v. Dow Chem. Co.*, 449 F.3d 1227, 1231 & n.2 (Fed. Cir. 2006); *Greenberg v. Bd. of Governors*, 968 F.2d 164, 168 (2d Cir. 1992); *see generally Restatement (Second) of Judgments* § 26(1)(a) (1982).

Aspex argues that the effect of the settlement agreement was limited to the Old Design products that were the subject of the California Marchon action.  According to Aspex, the agreement terminated the California Marchon Action and barred further litigation as to any actual or potential claims that could have been brought with regard to the Old Design products.  Aspex interprets the settlement agreement to carve out New Design products from the reach of the agreement, and thus not to bar any subsequent actions involving New Design products, which were first introduced after the Marchon suit was brought but before the date of the settlement agreement.  Mar-

chon, on the other hand, argues that the settlement agreement precluded Aspex from ever suing Marchon for infringement of the '545 patent based on either the Old Design or New Design products.

The settlement agreement between Aspex and Marchon expressly provided for the dismissal of the California Action, including "any claim which could have been had by and between the Parties arising from or connected with the California Action." The agreement further provided that the parties would release one another from any claims "which exist as of the Effective Date of this Agreement in connection with any Marchon Old Design Magnetic Eyewear made, sold, used, or offered for sale in the United States as of the Effective Date." In addition, the agreement stated that the mutual releases exchanged by the parties were inapplicable to "any cause of action . . . arising from and after the Effective Date of this Agreement." Finally, the agreement provided that Marchon would stop importing and selling Old Design products and would use its remaining inventory of Old Design products only for replacement purposes as part of its warranty services to customers.

The agreement plainly extinguishes any claims pertaining to Old Design products made or sold as of the effective date of the agreement. Equally plainly, it does not apply to New Design products (or potential products of other, undesignated designs) that had not been made or sold as of the effective date of the agreement. The only real question regarding the scope of the agreement is whether it bars infringement actions as to New Design products that were made and sold between early 2007, when the New Design products were first introduced, and the effective date of the agreement, February 4, 2008.

In order to construe the settlement agreement to reach those New Design products that were introduced during the several-month period before the settlement agreement was executed, we would have to conclude that the parties intended to depart from the normal rule that the products at issue in a patent suit are those in existence at the time the suit is filed. *See Gillig*, 602 F.3d at 1363. As this court has noted, the parties' decision to depart from the normal rules of claim preclusion by agreement "must be express." *Pactiv Corp.*, 449 F.3d at 1231. There was no such express agreement here. The focus of the settlement agreement is on the Old Design products; the only provision that could be understood to reach the New Design products is the parties' agreement to dismiss the California Action, "including . . . any claim which could have been had by and between the Parties arising from or connected with the California Action." Because the California Action was directed at the Old Design products, and the New Design products were not in existence at the time that action was filed, the most natural interpretation of that clause is that it refers to claims that "could have been had" at the time the action was brought. That interpretation is buttressed by other portions of the agreement, all of which pertain only to Old Design products: the mutual release, Marchon's agreement to withdraw from the market for Old Design products, and the agreed-upon disposition of Marchon's remaining inventory of Old Design products. We therefore conclude that the settlement agreement does not bar Aspex from suing Marchon based on New Design products, regardless of whether those products were in existence as of the agreement's effective date.

IV

The parties argue that if we do not affirm the judgment in this case on res judicata grounds, we should address several claim construction issues that have been decided by the district court and that will affect subsequent proceedings on remand. Because the district court's claim construction rulings did not result in a judgment of noninfringement, we are not compelled to address those rulings at this time. However, the claim construction issues that the parties have presented to us are likely to be dispositive as to the issue of infringement, and for us not to address those issues at this juncture would in all likelihood result in further proceedings in the district court followed by another appeal in which precisely the same claim construction issues would be presented. In the interest of judicial economy, we therefore exercise our discretion to address the claim construction issues presented by the parties. *See Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1379 (Fed. Cir. 2011); *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1383-84 (Fed. Cir. 2005); *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1437-38 (Fed. Cir. 1988).

1. *"An eyeglass device"*

All of the independent claims of the '545 patent begin with the preamble language, "An eyeglass device comprising." The '545 patent Abstract states, "An eyeglass device includes a primary and an auxiliary spectacle frames [sic] for supporting lenses." The parties disagree about whether the preamble language constitutes a limitation of the claim so that the claims are limited to accused products comprising both a primary and an auxiliary frame. That argument matters because the body of the two claims at issue in this case recites only an auxiliary

frame. If the "eyeglass device" is properly defined to include both the primary and auxiliary frames, and if the preamble language is limiting, as the defendants argue, a party would not be liable for infringement for making or selling the auxiliary frame alone.

While we agree that the term "eyeglass device" is defined in the patent to refer generally to the combination of a primary and an auxiliary frame, we do not agree with the defendants that the term "eyeglass device" adds a limitation to any of the claims. This court has recognized that as a general rule preamble language is not treated as limiting. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). In this case, the defendants have not pointed to anything that persuades us that this case falls outside of that general rule, and in fact all of the considerations that ordinarily inform the decision whether to treat preamble language as limiting support the conclusion that the preamble in this case does not limit the claims.

First, most of the claims of the '545 patent are drawn to both a "primary spectacle frame" and an "auxiliary spectacle frame." One claim is drawn only to the primary frame, and three claims are drawn only to the auxiliary frame. The fact that among numerous claims to the combination of primary and auxiliary frames the patentee chose to include some claims limited to auxiliary frames and some limited to primary frames supports the inference that the claims drawn to primary or auxiliary frames alone are not intended, by operation of the preamble, to require the presence of the other frame as well.

Moreover, the preamble language in the '545 patent is not needed to give meaning to the claims, which recite structurally complete inventions without the preamble

language. And nothing in the prosecution history suggests that the preamble language was considered necessary to the patentability of the claims. Under those circumstances, this court has found the preamble language not to be limiting. *See Am. Med. Sys., Inc. v. Biolitek, Inc.*, 618 F.3d 1354, 1358-59 (Fed. Cir. 2010); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Absent any countervailing reason to hold that the preamble language in this case is limiting, we conclude that it should not be construed as limiting in this case.

2. *"magnetic member"*

The defendants argue that the district court correctly concluded that the term "magnetic member" in amended claim 23 means a permanent magnet. Aspex disagrees and argues that the term refers either to a magnet or to a ferromagnetic member, i.e., a substance that is affected by a magnetic field. We agree with Aspex. The dispositive argument in favor of Aspex's construction is one of claim differentiation. New claim 35 is dependent from amended claim 23; the sole distinction between the two is that in new claim 35, the "magnetic members of the auxiliary spectacle frame are magnets." If "magnetic member" meant magnet, new claim 35 would be entirely duplicative of amended claim 23. That result would be at odds with the ordinary principles of claim differentiation, as "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). The defendants offer no reason not to apply that rule of claim differentiation in this case. We therefore hold that the term "magnetic member" in amended claim 23 must be construed not to be limited to

a permanent magnet, but to include ferromagnetic materials as well.

   3. *"rearwardly directed free end"*

The district court construed the term "rearwardly directed free end" in the limitation of amended claim 23 that recites "each of said arms having a rearwardly directed free end" to mean a "rearwardly directed end portion." Aspex argues that the district court's construction effectively reads the term "free" out of the limitation. We agree. The specification describes the arms by stating that the auxiliary frame "includes two side portions each having an arm 21 extended rearward therefrom." '545 patent, col. 2, ll. 40-41. While the specification does not use the term "free" in reference to the rearwardly directed end portion of the arm, the figures illustrate that each arm has a "free" end. Figure 4, which depicts the referenced arms, shows that each of the arms has a first end that is attached to the side portion of the auxiliary frame and a second end that is not attached to any other structure, i.e., it is "free." The claim language, taken in context, makes clear that the free end of the arm is distinguished from the end that is attached to the side portion of the frame. Accordingly, we conclude that the term "rearwardly directed free end" should be construed to mean the end of the arm that extends rearwardly from the frame and is not attached to the side portion of the frame.

   4. *"said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame"*

The plaintiffs separately challenge the district court's construction of the term "adapted to" in the above-quoted

limitation of amended claim 23 as well as the court's interpretation of the entire limitation. We address the two together.

The district court construed the quoted limitation to mean that the arms and the pair of magnetic members are made to extend across the top of the respective side portions of the primary frame. In light of its interpretation of that limitation, the court construed the last clause of amended claim 23 to require that the magnetic members of the auxiliary frame have downwardly facing horizontal surfaces that permit them to be "stably supported and secured on top of the upwardly facing non-embedded magnetic member surfaces on a primary spectacle frame."

Aspex's first objection to the court's ruling on that limitation is that it construes the phrase "adapted to" too narrowly; that phrase, according to Aspex, should be interpreted to mean "suitable for" rather than "made to." As the parties have noted, the phrase "adapted to" is sometimes used in claim drafting to carry the broader meaning proposed by Aspex, and sometimes to carry a narrower meaning closer to that proposed by the defendants. In this case, we conclude that the narrower meaning is correct.

In common parlance, the phrase "adapted to" is frequently used to mean "made to," "designed to," or "configured to," but it can also be used in a broader sense to mean "capable of" or "suitable for." *See Webster's Third New International Dictionary* 24 (1968) ("suited by nature, character, or design to a particular use, purpose, or situation"); 1 *Oxford English Dictionary* 139 (2d ed. 1989) ("fitted; fit, suitable . . . modified to fit new situations"). The way the phrase is used in amended claim 23 of the

'545 patent supports the district court's conclusion that a narrower definition, such as "configured to," applies here. *See Sta-Rite Indus., LLC v. ITT Corp.*, 682 F. Supp. 2d 738, 753 (E.D. Tex. 2010) (construing "adapted to," in context, to mean "designed or configured to," not "having the capacity to"); *Boston Scientific Corp. v. Cordis Corp.*, 2006 WL 3782840 (N.D. Cal. Dec. 20, 2006) (construing "adapted to," in light of patent as a whole, to mean "configured to," not "capable of").

Amended claim 23 refers to the arms and magnetic members as "adapted to extend across respective side portions" of a primary frame. In that context, the phrase "adapted to" is most naturally understood to mean that the arms and magnetic members are designed or configured to accomplish the specified objective, not simply that they can be made to serve that purpose.

Other intrinsic evidence from the '545 patent supports that narrower interpretation of the phrase "adapted to." The specification refers to the magnetic members of the auxiliary frame as being "for engaging" with the magnetic members of the primary frame. '545 patent, Abstract; *id.*, col. 2, line 45. That expression suggests that the magnetic members of the auxiliary frame are meant to engage with the magnetic members of the primary frame, not simply that they are capable of doing so. Moreover, claim 22—the claim immediately preceding amended claim 23 in the patent—recites first magnetic members that are "capable of engaging" second magnetic members. The fact that the two adjacent claims use different terms in parallel settings supports the district court's conclusion that the two terms were not meant to have the same meaning and thus that "adapted to" was intended to have a different meaning from "capable of." *See Boston Scientific Corp.*, 2006 WL 3782840, at *2 (relying on use of phrase

"capable of" in another claim in same patent to construe the phrase "adapted to" more narrowly); *see generally Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (when different words are used in separate claims, they are presumed to have different meanings); *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) (same).

Aspex next objects to the district court's conclusion that the claim language "extend across respective side portions of a primary spectacle frame" means "extend across the top of the respective side portions of a primary spectacle frame." We reject Aspex's argument. In construing the requirement that the arms and magnetic members "extend across respective side portions" of the primary frame, the district court first relied on the specification of the '545 patent. In particular, the court pointed to the statement in the specification that the arms of the auxiliary frame are "engaged with and supported on the upper portion" of the primary frame so that the auxiliary frame will be "stably supported on the primary spectacle frame and so as to prevent the auxiliary spectacle frame from moving downward . . . from being disengaged from the primary spectacle frame." '545 patent, col. 1, line 63, to col. 2, line 2; *see also id.*, col. 2, ll. 49-56. That passage from the specification provides substantial support for the district court's interpretation of the disputed claim language.

The district court also relied on this court's statement in its opinion addressing the California Actions, in which this court referred to the invention as one in which "an auxiliary frame . . . can be top-mounted onto the primary frame to address the 'stable support' issue." Moreover, this court agreed with the district court in that case that the inventor had "disclaimed an auxiliary frame that is

not stably supported in top-mounting configuration." *Revolution Eyewear*, 563 F.3d at 1368. In light of the language of the claims, the description of the invention in the specification, and this court's previous decision, we agree with the district court's construction of the limitation that recites "said arms and said pair of magnetic members adapted to extend across respective side portions of a primary spectacle frame."

V

In sum, we reverse the district court's grant of summary judgment on res judicata grounds to Revolution and Marchon with respect to products that were not at issue in the California Actions and were not covered by the Marchon settlement agreement, in particular the New Design products sold by Revolution and Marchon. We remand for further proceedings, including a determination as to whether the New Design products that Revolution introduced during the pendency of the Revolution California Action were included within the scope of that litigation, and whether principles of collateral estoppel have any effect of limiting Aspex's rights to proceed under the '545 patent against the defendants. If the court determines that Aspex's action against one or more of the defendants is not barred, the court will be required to determine the issue of infringement based on the construction of the critical terms of the two claims at issue in this case.

Aspex's allegations of induced infringement against Zelman and Nike stem from Revolution's and Marchon's alleged direct infringement, respectively. Given our holding above reversing the district court's grant of summary judgment in favor of Revolution and Marchon, the district court's grant of summary judgment in favor of

Zelman and Nike is likewise reversed and the proceedings against those defendants are included within the scope of the remand.

Each party shall bear its own costs for this appeal.

**REVERSED AND REMANDED**